Good afternoon, ladies and gentlemen. We're here to hear the matter of Jasper N. McMurtry III v. Charles L. Ryan, the warden. And each side has 30 minutes. Ready to proceed. Good afternoon, and may it please the court. My name is Patricia Nigro, Assistant Arizona Attorney General, and I represent the appellate respondents in this matter of the state of Arizona. The state asked this court to reverse the district court and deny the writ because the district court wrongly failed to give the proper weight to the state court's factual findings that Mr. McMurtry failed to prove his incompetency at trial, and also failed to prove that his counsel was ineffective for failing to raise the issue of incompetency at trial. The state court's factual finding of incompetence is entitled to a presumption of correctness if fairly supported by the record. In this case, the state court judge- You're talking about the hearing that went back? Yes, sir. In 1994, the evidential hearing. Fourteen years. Yes, it went back 13 years. The trial was in 1981. The hearing was in 1994, and the reason- and I realize that there's an issue about whether you can do a competency hearing that many years after the fact. In this case, the state court judge was the same state court judge who heard Mr. McMurtry's trial and his three sentences- sentencing, excuse me. There were also several witnesses that were contemporaneous that were at the trial and at the sentencing and could give testimony to the trial judge about what happened at that time. Counsel, there's two- There's two questions here on the question of the hearing. One is the question as to whether they should have held a hearing, and the other is the question as to whether he was competent had a hearing been held. And I understand you now to be arguing that the second of those, that is, that in fact he would have been found competent had they held a hearing, is the result of Judge Arnold's findings in 1994, and that's when the district court made an error. Yes, Your Honor. And there's no reason for us then to have a hearing. There's no reason then to have had a hearing in 1981. Correct, because Mr. McMurtry was in fact competent. Okay, so you're arguing that the first issue, the question as to whether he should have had a hearing, the Pate hearing is subsumed in Judge Arnold's conclusion on his competence. That's correct, Your Honor. How can you hold a question of- a competence hearing 13 years after the fact? You can do it in the case where there are witnesses who were at the trial at the time it happened, the same state trial judge that heard the trial and observed Mr. McMurtry at trial and sentencing, and you also had a witness, Dr. Wall, that had examined Mr. McMurtry back in 1981 and testified at the 1994 evidentiary hearing. But you don't have a case here where there's just a record review and no contemporaneous witnesses, no contemporaneous facts presented to the state judge. In this fact, in this case, we've got numerous witnesses that were there at the trial, and those included Dr. Wall, who testified at trial and who also examined Mr. McMurtry for competency prior to the trial, four months prior. Mr. Himlick, who was the prosecutor- Well, that's four months before the trial. Correct, Your Honor. He also met with Mr. McMurtry prior to- Let me ask you, did the trial judge have all the information about the different drugs that Mr. McMurtry was taking during the course of the trial and shortly before? During the- I'm sorry. Go ahead. Did he have all that? At the time of the trial? Is that what you're asking? No, at the time of this hearing. At the time of the hearing, yes, he had information about the medication. What he had information about, let me clarify that, were the medications that were prescribed to Mr. McMurtry. The actual medication records that would indicate what medications Mr. McMurtry actually took were not available at the 1994- They were lost or destroyed, huh? Correct. How come that happened? Honestly, Your Honor, the only information the state has, and Mr. Shea can correct me if I'm wrong on this, I believe the Pima County Jail only keeps those records for a certain period of time. So by the time the evidentiary hearing came around, those records were no longer available. What was available- Even on death penalty cases. Apparently, Your Honor, I don't- and Mr. Shea has argued that the jail is somehow an arm of the state, and they're not. They're separate from the state. They follow their own internal policies, whatever they are, on medication records, and they didn't have those available anymore. Certainly, the state would have the power to tell the jail what it wants, and I'm sure the jail would accommodate the state. It's just the state didn't do that. Well, that's correct, Your Honor. The state didn't do that back in 1981 because the issue of competence was raised prior to trial and was resolved and was not raised again until many years later. Yeah. Let me ask you this, again, back to focusing on the 1994 hearing in front of Judge Arnold. You make the point that Dr. LaWall testified at that 1994 hearing, and Dr. LaWall had, in fact, also examined Mr. McMurtry. But the response to that, at least the response given by the district judge in this case, is that the issue was not whether Mr. McMurtry was competent in March when Dr. LaWall did what he called the Rule 11 investigation, even though, by that point, Dr. Drup had finished. I guess this was now triggered by the indication that there was going to be an insanity defense pled. But the argument is not that he was incompetent in March. The argument is that he was incompetent in July, and he was incompetent not because of some chronic, relatively stable condition of incompetency, but rather because of increasing anxiety and increasing drug dosage. Therefore, what do we do with Dr. LaWall's March 1981 investigation? I'm not sure it tells us very much. Well, I think it's part of the evidence that needs to be considered, and it's part of the evidence that was considered. I'm not saying it is the only evidence. It's part of the evidence to be considered by the state judge. And again, if there's factual support for his findings, there's a presumption of correctness that should apply. And it was Mr. McMurray. This is the same trial judge. I hate to say it this way, but this is the same trial judge who, at sentencing, when there's been a motion for a new trial, he responds, the court feels that there is no evidence whatsoever that Mr. Mercury's medical treatment at the jail had any effect on his ability to defend himself. Well, that can't be right. I mean, we may argue about how much evidence it is, what the consequence is. But to say there is no evidence whatsoever that the drug medical treatment had any effect, that simply can't be right. Well, that statement was made at the time of the sentencing. But this is the same judge you're now relying on saying, well, he knew what was going on. He saw it before and was supposed to defer to him. What he saw was what was going on in the courtroom. Later, at the 1994 evidentiary hearing, he heard from Mr. McMurtry's attorneys. He heard from the prosecutor. He heard from the case agent. He heard more evidence at the 1994 evidentiary hearing. I believe in 1981, that statement was based on his observations in the courtroom. But, gee, he's also the judge that should have, I think, to a spot there, called for a confidence hearing at the time of the trial. And this case went back to him three times, isn't it, from the Arizona Supreme Court? Yes, Your Honor. And that was based on the consideration of mitigation evidence, and the appropriate way to consider mitigation evidence, and the burden of proof on mitigation evidence. So that all dealt with mitigation, all the remand. Let me ask you this, and this is a hypothetical question, but I'm asking you to pretend something that's not true. But let's pretend that the 1994 hearing didn't take place. So the only evidence we have in front of us in terms of whether or not there was enough evidence in front of Judge Arnold in 1981, at the time of trial, or at the time of sentencing, that he should have, sua sponsae, have conducted a hearing. Was there enough evidence at that point that Judge Arnold should have not, I'm pretending the 1994 hearing didn't take place. At that point, what Judge Arnold knew is that there had been a competency finding four months prior to trial, and that Mr. McMurtry was found to be competent by another judge, Judge Druk. He knew that there was some issue with Mr. McMurtry getting ill in the courtroom, which could have been caused by a lot of different things. And I guess in sentencing, he was aware of Mr. McMurtry's statements at sentencing. Well, he had the PSR. I don't know, is that what they call it in Arizona? Yes, Your Honor, it's a pre-sentence report. He had that as well. The PSR contained some stuff that was pretty, well, it had some pretty strong hints that this man wasn't right. And again, that could have been for a lot of different reasons. As was his statement at sentencing, to get back to that a little bit. He had apparently the sheet to which his attention was drawn of all the medications. And he says, well, listen, I'm not a doctor. I have no idea what this means. If he had no idea what this meant, maybe he should have asked for a doctor. He knew that Mr. McMurtry was creating problems in the jail. And he knew that he was being heavily medicated, apparently he had a piece of paper that was presented in connection with the motion of the new trial. Well, I have to respectfully disagree that he knew he was heavily medicated. I don't think the judge knew at that point which medications were actually being administered. There's a sheet with a lot of drugs on it. And he says, and I'm sympathetic at this point, because I'm afraid I'm at that level of confidence as well. He says, how do I know what this means? I'm not a doctor. But, so, get a doctor. Find out what it means. It's the state's position that at that point, there really wasn't enough to trigger it. But even if there was enough to trigger it, that the 1994 evidentiary hearing took care of that and was a retrospective competency hearing. Yeah, no, I understand that argument. For the time being, I'd simply ask you to put that to one side. But, okay, I understand your answer. And just to talk a little bit, since I brought it up, about Mr. McMurtry's statements of sentencing. Those can be interpreted different ways, I think. But one way to interpret that is that Mr. McMurtry fully understood the import of the decision that the judge was going to make. He understood that it was basically the most important decision affecting him that could be made, whether he was going to receive the death penalty or not. And the fact that he addressed God and asked God to give the judge wisdom doesn't go to show that he was incompetent. It actually goes to show that Mr. McMurtry understood the import of that decision and how serious it was. I never heard of that happening, that sentencing proceedings. Is that unusual? I honestly can't say. I don't have any empirical evidence one way or another whether that's unusual or not for a defendant to do that. I don't believe it's unusual for a defendant to ask for God's wisdom in that kind of a situation where his life is at stake, basically. How come Arizona failed to move to stay the district court's judgment and then the petitioner was released? It had 180 days. Honestly, Your Honor, I'm not sure exactly why that happened. I didn't have the case at that point. I believe it was an oversight on the attorney who had the case before me. But there was a hearing that would have taken place anyway that determined that Mr. McMurtry was entitled to be released pending his new trial. So it's my understanding that that's what happened. But again, Mr. Shea would know that better than I. But I believe that's what happened. You know, the excerpts of record that were filed were inadequate. You got our order, didn't you? I did file the documents that the court asked for. Yeah, but those were documents that you referred to in your brief. I believed that the portions I referred to were included in the excerpts of record. You have to check that, you see, because then that just creates a lot of work. We have to go find all those huge boxes and sift through them and try to find them. And he was also, wasn't he offered a plea agreement of what, 21 years? And he served that already, hasn't he? I believe he served two years more than that, Your Honor. Two years more than that. And again, Mr. Shea can correct me if I'm wrong, but I think that Mr. McMurtry has served 23 years. And that was the plea offer that was made at the time of trial that he chose to reject based on his belief that he was actually self-defense. You know the missing documents that we asked for? They were filed late. Did you know that? Actually, Your Honor, I spoke to the clerk and the order, I wasn't clear on the order that they were supposed to be filed on that day. I thought it was like someone briefed at mailing. You have to read our rules, see. I apologize, Your Honor. If the court... Let me ask you this, and this was, I think, preceded the time of your involvement in the case. A lot of the events took place probably when you were in grade school. But it puzzles me that the state should have been simultaneously pursuing this as a capital case and willing to offer a plea of second-degree murder with a sentence of 21 years, which, with credit for time served, would have worked out to considerably less than that. Can you give me some insight as to why the state simultaneously had such, what I view as such divergent views of the very same case? I can only speak from my own personal experience. Having done trial work in death penalty cases, there are a lot of reasons that the state may offer a plea. Obviously, before someone's convicted, there's no guarantee that there's going to be conviction. So sometimes it makes sense for the state to offer what it feels to be an appropriate plea to assure a conviction, to avoid... There were a lot of... A victim had to be brought in from out of state in this case. I obviously can't speak for why Mr. Hamlet did what he did. I do know there are always considerations for offering a plea in any case, because the state is never assured of a conviction until it actually happens. And it's easy in hindsight to say, oh, well, the state had a great case, but you never know what a jury's going to do. So I would assume that was the reason that an offer was made in this case. Okay. And if it's okay with the court, I'd like to reserve the rest of my time. Thank you. Okay. Thank you. Thank you. May it please the court. My name is Nat Man Shea and Greg Kirkendall at counsel table, and I have the pleasure and privilege of representing Mr. McMurtry. It's always been a pleasure and privilege to argue in front of this court, but this is of particular enjoyment, I guess, because of the fact that Mr. McMurtry, the petitioner, is here seated in court with us. And I wish I'd been in grade school. That's a way to make an introduction. Well, my mother always taught me to be nice, so I try. I unfortunately was not in grade school when all this was happening. And I might have misjudged as to the question. Well, I guess what that leads me to is the fact that I've been working with Mr. McMurtry on this case for 18 years, and as the court knows in this kind of litigation, there have been all sorts of complex litigation, many, many issues raised, questions of procedural default and all of these things. But I find myself here after all this time, and what is really before the court and the decision the court has to make, I think is quite simple. And I'm referring, of course, to the issue that Judge Nielsen granted relief on, which I would refer to as the PATE issue or the procedural due process issue. And it's very important at the outset to distinguish the tests that are used when there are questions of competence. In the PATE or procedural issue, it was decided in 1966, the question is, as the court has pointed out today, did the information that the trial judge have raise a reasonable doubt about the defendant's competency, and if so, can a meaningful retrospective hearing be held? There is an entirely separate issue, and this has been reaffirmed over and over again, perhaps most recently by Boyd v. Brown, 404 F. 3rd of 1165 was a decision from this court last year, that if the information before the judge at the time of trial and sentencing did not raise a reasonable doubt as to competence, the defendant can still prevail in a post-conviction hearing by proving by a preponderance of the evidence that he or she was actually incompetent at the time. And those are two very different issues, just as a Miranda violation is different from a voluntariness violation. So let me ask you, you know, we've got a lot of issues here. What's your best argument in 15 seconds or less? Oh, my best argument is that... Someone wrote a book on that, you know. I'm afraid I didn't read it. Being a lawyer, it's hard to do anything in 15 seconds. But very simply this, the state court never decided the paid issue, number one. Number two, the state of Arizona waived the argument that that issue was wrong. The state never argued that the paid issue should not be granted in state court. It never argued the paid issue should not be granted in district court. And it has not argued to this court that the paid issue should not be granted. The state has... That's just the default question. Okay. Exactly. Sure. Now let's have it in front of us. What's your best argument? Well, the best argument is that Judge Nielsen was right. That clearly... Just give it to us in a nutshell. Well, in a nutshell, at the time of trial, the trial judge was aware of... But your best argument is that at the time that this trial was going on, there was enough going on that the judge should have sua exponte, called for a competency hearing. Absolutely. And certainly the defense lawyer should have requested that. Okay. But one or the other should have. Oh, absolutely. Okay. And certainly 13 years later, it was not possible to have a meaningful hearing. Putting to one side for the moment the ineffective assistance of counsel, that is to say what the two defense counsel knew and should have brought to the attention of the judge. Putting that to one side, what did the judge see or hear or in some fashion know that alerted him that we needed a competency hearing? And at what point does it rise to the level of it's right there in front of him and he should have done it sua exponte? Well, as to the first question, it arose over and over again. He received a report from December of... A motion in December of 1980 saying that Mr. McMurtry needed to be examined in a drug-free state, talking about his prior hospitalization, his head injuries, his deteriorating mental state. Okay. Let me short circuit that a little bit. That is, we have a determination by Judge Druk in late February who gets documentary evidence. He does not have a live hearing, but he gets letters of evaluation. He gets the two scientific tests that show no organic problems. And at that point, and I think it's February the 21st, Judge Druk says, I don't need a full-blown competency hearing. I find that this man is competent to stand trial. Well, at that point, I think that Judge Arnold is probably under no obligation sua exponte to himself ask for another evaluation. So what happened back in December preceding Judge Druk is maybe it's still in the record in the sense that he should be aware of it. But as of February 21, I don't think there's any obligation on the part of Judge Arnold. Okay. Well, I won't argue with you about that because I don't think it matters. The one thing I would point out that Judge Druk apparently overlooked was the report from Dr. Garcia-Bunuel, which was provided to Judge Arnold before Judge Druk's ruling. But Judge Druk goes through the reports that he saw, and that's not one that he refers to. And that report referred to memory problems, hallucinations, mood swings, the drugs, and this doctor concurred with Dr. Gerland. But as we get closer to that... Let's just forget about that. I mean, not forget about it, but let's move beyond that. And so here's the trial. We're getting ready to go. And what occurred during the trial, what information did the trial judge have that should have caused him to have a bona fide belief that there may be a problem here with his defendant's confidence to stand trial? Which, you know, that means that basically that he needs to be able to communicate with his attorney and really know what's going on. So what did he have? Well... Try to focus. I know you've got a lot of paper if you want to get through all of this. Oh, I never have more than one pages of notes. I really expect you to. Oh, I know. I haven't read what we have either. But just focus on that. Well, Dr. Santiago testified at trial. He was the chief of psychiatry at Keno Hospital where Mr. McMurtry was taken when he attempted suicide. And he described Mr. McMurtry's illness as episodes being provoked by stress and that they impair gravely on his ability to function, that they render him unable to interpret what is happening in a logical and coherent fashion. What did he do in court? The judge is sitting up here. Here's the defendant. What should the judge, had his eyes open, have seen? Well, and that's the problem. One of the problems with Judge Arnold is... Well, forget about Judge Arnold. A reasonably prudent judge, yeah? Well... Who's reasonably awake. A reasonably... He should have seen. Sure, sure. Well, and of course we don't know that because we can only speculate. But all that anybody could really see is Mr. McMurtry sitting at the table, writing, whispering. At one point, according to the detective, when his father was testifying, he put his head down on the desk and appeared to be crying. But, I mean, the point is, and one of the major points is, that sitting up there, I use him as a prop. You can look at Mr. Kirkendall, and he looks like he's paying attention. But there's no way for anyone to know. So then what is Judge Arnold supposed to do if he can't see anything that should alert him to the fact that the defendant may not be aiding his counsel? If the counsel won't speak up, and if there's nothing else, no other objective evidence, then what is Judge Arnold supposed to do? And why is there a constitutional violation here if there's nothing to alert the judge? Oh, no, no, no, Your Honor. And don't get me wrong. There were a lot of... Dr. Santiago's testimony, it seems to me, is a pretty weak thread here because he's not there to testify that Mr. McMurtry is currently incompetent. He's there to testify that Mr. McMurtry is incompetent in all aspects of his life, including the night on which he committed these murders. And the question as to whether Mr. McMurtry is confident to stand trial has already been answered by a whole raft of doctors. Now, so what's Judge Arnold supposed to do? Well, he's supposed to, first of all, be aware of what the other doctors had said, and they were not in agreement on incompetence. He's supposed to pay attention to the fact, and this is extremely important, that the doctors testified to the fact that Mr. McMurtry was receiving all sorts of drugs, mind-altering antipsychotic drugs, that were given in a changing dosage that Mr. McMurtry was ill in court repeatedly, so much so that the judge himself called the jail to check on, among other things, Mr. McMurtry's nervous condition. But a mere nervous condition, does that trigger, does a mere nervous condition trigger a paid obligation? Oh, no. But the warnings from Dr. Gerland, Dr. Garcia-Boonwell, the evidence that he was on Thorazine, Elevil, that he was receiving injections of Valium, Dalman, chloral hydrate, Dr. Gerland testified that he was receiving enough Thorazine, when he'd seen him earlier, to knock out an ordinary person, that he was receiving five times. But it was evident that he wasn't knocked out. So, what it would do to an ordinary person, of course, is of no account here, because he's got the defendant in his courtroom, he can see him writing notes to his counsel, he can see him being responsive to witnesses. Well, we don't know that. Well, no, you just told us that he was responsive to witnesses, specifically his father. Well, that he put his head down, and that's the detective's testimony. Are you disputing that? No, no, no. Okay, well, then we ought to admit it, right? Well, that's fine. I mean, I don't have a problem with that. The other thing that happened, and it's a major event here, was the motion for new trial, in which the defense lawyer again repeated that he was giving all of these drugs, Thorazine, Ativan, Valium, et cetera, that his unstable mental health further declined, that he was on the verge of a nervous breakdown, that he was in a chemical straitjacket. I mean, certainly at that point. But the argument doesn't go to his ability to aid the counsel. It's the one argument the counsel didn't make, and the counsel was in an excellent position to see. The argument that he makes is that it altered the jury's perception of the defendants. Well, it does. But the question is, did it do enough to cause a reasonable judge to have a reasonable doubt? It evidently didn't do enough to cause a reasonable attorney to question whether he'd been aided in his defense by a client. Well, he wasn't a reasonable attorney, Your Honor. I mean, first of all, we have to keep in mind Mr. Polis had only been practicing for five years, and Mr. Sadaka two months. Was he appointed counsel? Or was he hired? No, he was retained. But I don't think that's relevant. And certainly, 13 years later, when Mr. Polis and Mr. Sadaka both had more experience, they very frankly and candidly admitted that they made a horrible mistake by not raising this at the time of trial. Would somebody with Mr. Polis' experience be allowed to represent a defendant in a capital case today, even if privately retained? No, Your Honor, not in Arizona. And that's something that Judge Nielsen did point out in his... Well, let me ask you this. Mr. McMurtry, he had memory problems, right? I'm going through a list here. That was one of them, yes. One of them. But this was something that was diagnosed by an expert who referred to him before the trial. That's, yeah. Several experts. What? Several of the experts. Several of the experts. And then he, my notes show he was behaving erratically. And there were times when he was speaking in an extremely loud, rambling, tangential, philosophical, and at times crude manner. And he was highly agitated and impulsive, interspersed with periods during which he appeared to be sleepy. The records show that was going on during the course of the trial? No, but that was in the pre-sentence report that the judge received, as was, for example, during the mitigation hearing, the judge learned that Mr. McMurtry had been hospitalized for about 10 days, three months before the trial because of a suicide attempt. The judge learned that he was engaging in threatening behavior. The judge learned that he was smashing his head into a window, bashed his head into a jail, put him on a suicide watch, that Mr. McMurtry would go from cheerful to extremely violent in a very short period of time. But all of those things are perfectly consistent with the reports that came from the doctors in January and February of 1981, that Mr. McMurtry was subject to wild mood swings, that he had episodes in which he couldn't control his emotions and would become enraged. All of those things are perfectly consistent with the reports that were already there. And those doctors have largely, again, they're not entirely consistent. They don't seem to agree on the diagnosis as well, but they do seem to agree that he was competent to stand trial. Well, I don't believe that, in fact, Dr. Gerland did not. Right, we had one doctor who thought not, but nobody else seemed to agree with that. But keep in mind that the other doctors, I mean, if you talk about Dr. Genetti or Dr. Lawal, that they don't say anything, or the psychiatric social worker, Ms. Ford, don't say anything about being aware of the drugs, the dosages of the drugs, and the effects that they could have on him. But, you know, it's one thing to say, well, he has mood swings. It's another thing to say, here's records that he slashed his wrist. Here's records that he slammed his head into objects. And those things happened after Judge Krook made his school 11 determination. Absolutely. This all happened. Judge Krook made his determination mid-February. The suicide attempt happened in late March. No, I'm sorry, late February, about 10 days after. It was right after. Right. And then there was a report, a testimony that the judge heard from Dr. Gerland at the time of the trial that he saw Mr. McMurtry on March 5th in the psychiatric ward, that he had a psychotic breakdown, that he was suicidal. And again, the jail records show that the same thing is happening during the trial. So even though the testimony was really being offered to the jury by Dr. Gerland and by the others, the trial testimony was being offered to support the insanity defense. Right. Judge Arnold was hearing testimony that showed that his mental state had deteriorated since Judge Krook had made his determination.  That's the point that you're making. Yes, and also some of the testimony went to mitigation prior to sentencing. Dr. Santiago, for example. And of course, at the same time, I mean, Mr. McMurtry is becoming ill in court. I just asked you, what was there in front of the judge at the time this trial was going on? It's just a simple question. I don't know if you've answered that, have you? Well, I'm trying. You jump around a lot, you know. If I may, I'll try to be a little more... Like one, two, three, four, five. Sure. Well, he learned that Mr. McMurtry had slashed his wrist, attempted suicide, was hospitalized for about 10 days. And this is all after Judge Krook had denied the competency hearing. He learned that he had had a psychotic breakdown, according to one doctor. He learned that Mr. McMurtry's medications were being changed. And at one point, Dr. Perrin, the jail doctor, expressed concern that Mr. McMurtry was receiving such high dosages of these various drugs. He heard that Mr. McMurtry... Did he say what effect the drug would have on a patient? Dr. Perrin did not. And that's part of the problem. Go ahead, let's take it off the air. The jail nurse referring to Mr. McMurtry receiving phenobarbital, Ativan and Dalmain,  jail records that he went from being tearful to extremely violent in a flash. That the jail was... This was introduced at the trial. No, I'm sorry. This was in... I'm asking you for at the trial. Okay. And you go to the other one, you know. Okay. I'm sorry, Ron. I'm glomming, I guess, all of the evidence that came up at trial through sentencing. It'd be easier, at least for me, if we had order. Okay. At the trial, Mr. McMurtry became ill, causing the judge to call the jail. Dr. Santiago testified that stress would provoke episodes in which Mr. McMurtry would be unable to interpret what went on around him in a logical, coherent fashion. And that it would... His emotions would impair gravely on his ability to function. Dr. Gerland testified about the tremendous amounts of Thorazine that he was on, that he was receiving five times an addictive dose of Librium. This is that trial Dr. Gerland testified? That's correct, Your Honor. And we have the illness and then, you know, a great deal more comes out in the days and weeks following the trial, but prior to the sentence. Now, it comes out in the days and weeks following the trial, prior to the sentencing, but it comes to the attention of the judge really only when he gets the sentencing documents, PSR and so on. Is that right? No, the first thing was the motion for new trial. Oh, I see. So he sees, yes, he sees whatever's in that motion for new trial, of course, at the time the motion is made, and he rules on that motion at sentencing. How long, I'm sure it's in the record, but I don't know the answer to this. Do you know how far in advance of that August 18th sentencing date, the motion for new trial was made? How long did Judge Arnold have to study that? The sentencing was actually on August 28th, Your Honor. Oh, I missed that by 10 days. The motion for new trial was, I'm afraid, the one thing I don't have in my notes. I can, don't worry, I can look it up, that's all. I believe it was within 10 days of the trial by rule. What happens if we really don't have as much, enough evidence to alert the judge of a sui sponte obligation to hold a competency hearing until after the trial? Well, does that make a difference that we really, that the verdict is in and so on, or does he have the same obligation to go back and indeed undo the trial? Oh, sure he does, Your Honor. What's your authority for that? And I always get the two confused, whether it's Moore or Morris versus United States. Specifically held, I believe it was Moore, that the defendant must be competent at sentencing. And if evidence comes out after the trial, but before the sentencing, that raises a reasonable doubt as to whether the defendant was competent during the trial or is presently incompetent. Certainly the judge has an obligation at that point to take action. If we agree with the district judge that Judge Arnold at some point, maybe as late as the day of sentencing, but has an obligation given what's now finally accumulated in front of him, to order a sui sponte competency hearing, he fails in that obligation. And if we agree with the district judge on habeas, that the 1994 hearing can't cure the problem because it's just too late. Thirteen years later, the only person testifying who was involved in those earlier events is Dr. Lawal, who in fact was not a precipient witness because his last serious interview for this purpose was in March, long before the trial began. What do we do? That is to say, is the fact that a hearing didn't take place and we don't know what would have been found had the hearing taken place, is that enough to reverse the trial? Oh, absolutely, Your Honor. I mean, all we are asking is a per se prejudice. Yes, absolutely. Well, Your Honor, I guess I would start with the fact that the Supreme Court, and it did in Cooper, quoted Judge Kennedy as far as the importance of competence and the fact that it is fundamental to trial, so much so that this is a very rare instance in which the defendant and defense lawyer don't have to object to cause the issue to come into play. After you write on the case law and your time is starting to run on these, let me ask another question. What if, and this is a what if, what if I conclude that there wasn't enough evidence in front of Judge Arnold to obligate him sui sponte to order such a hearing, but that there's ineffective assistance of counsel, that Mr. Polis knew enough evidence that if he put it properly in front of the judge, the judge then would have had an obligation to do it? What then is the standard of harmlessness? I mean, I understand I'm dealing with Strickland, but what's prejudice in the context of Strickland? Is prejudice being that the information wasn't put in front of the judge? Is that enough, or what happens? Well, what happens, and this is in Judge Nielsen's order, is that you have to go back and look at the evidence that's available and decide whether it would cause, raise a reasonable probability that Mr. McMurtry was not competent. That is something less than a preponderance of the evidence. And if it does, at that point, prejudice is shown and a new trial has to be ordered. Essentially, all we are really asking. Well, I mean, let's say you have, we look at this two ways. Let's say that there's enough here so that the judge, on his own motion, should have said, well, I see a problem here, we're going to take a recess on this case for a short period of time, and we'll have the defendant examined, then we'll have a hearing on his competency. Let's say we had that situation. He doesn't do that, and the trial goes, and there's a conviction, there's a sentence, and let's assume that there's bona fide evidence that raised this issue of competence and that the judge should have, should have, a call for a competency hearing. Okay? Then what's the consequence of that? Well, then we get to whether at the time that that determination is made. Well, say it happens, say that determination happened a week after the trial. Well, then I think it would just be a typical, as they're calling it in Arizona, Rule 11 hearing, or competency hearing, which the court would have to decide whether or not Mr. McMurtry was or was not competent. Well, I suppose the cleanest shot you got is at the lawyers. Well, I think that makes it a little better, but comparing this case, for example, to Moran v. Godinez. Well, I mean, the lawyers were there, right? Sure. And he was behaving erratically, speaking loudly, and doing all those things, and talking about poaching, and all that other stuff, and throwing up, and all the rest of it. They were there, right in the middle of it. It seemed to me that if there was a problem, they were the ones that should have called it to the judge's attention. So they're the ones that really fell down on the job here. No question. They had the primary responsibility to raise the issue. What inferences do we take from the fact that they never once complained to the judge about this? Well, I think that they were inexperienced, and that they didn't know what they were doing. But it's also clear that as trial counsel, that it doesn't appear that they were inadequate as trial counsel. That is, that we've investigated a number of things, that they've brought in witnesses, that they've done the things that a competent defense counsel ought to do, within a broad range. It's a broad range of things. And they have raised the question of how he was behaving in court. But their concern was how the jury perceived him. Not once did they ever say, you know something, Your Honor? We can't get a thing out of our client over here, and he is so doped up that we haven't got a clue what's going on, and we ask him questions, and he doesn't respond. We don't get any of that hint until six years later, 1987, right? For the first time. Well, that's correct. Which was the first opportunity that Mr. McMurtry had to raise it with new counsel. And he did. But the state court did not do anything. The state destroyed the records. And if the court had taken action then, it might have been a different situation. But instead, we had to wait seven more years. Clearly, even if the defense lawyers did some things well, they did a horrible job as far as their client's competence went. And I would submit that this is a very simple request. We are not asking for the moon and the stars. All we're asking the court to do is apply a precedent that's been in effect for 40 years. And by doing that, grant Mr. McMurtry the new trial that the district court ordered, because his due process rights were violated. And it's as simple as that. Well, I mean, was the judge, what was his name again? What could it name? Arnold. Arnold. I mean, was he threatening to these lawyers? Was he nasty to them? During the 1994 hearing? Was he yelling at them? And I mean, was he afraid of them? Or didn't want to, you know? Well, he was... I'm asking you these questions. Sure. There is no question that Judge Arnold acted as a stakeholder, not as someone who was independent. And yes, he was very aggressive towards them. He was very harsh. But to their credit, the defense lawyers stuck to their guns. What did he say when he denied? Well, he didn't... Well, when the issue first came before him on competency, what did he say? Well, I mean, the first time it came up, as far as the motion for new trial, when is the court... That's the first time it ever came up before... No, it actually was raised back in February, but that was sort of deferred to Judge Druk. But I mean, before Arnold. I'm not talking about... Right. Well... Arnold, Arnold. In the motion for new trial, I mean, I would submit if the defense lawyer... He may not have said the magic word competence, but he said the client's in a chemical straitjacket, his unstable mental state further declined, that that raised him. And Judge Arnold made two mistakes there. And the two mistakes that carried through the rest of the history of the case. And one, as the court pointed out, is he said, well, I'm not a doctor. So I don't know what this means. Well... He went through that. Right. But let me ask you this. Did you prepare jury instructions? Did I? No, no, I mean, the defense lawyers. Yes. And was there an instruction there on the elements of the offense? Yes, there was. And there was, of course, a sanity instruction. I know that. I just asked you if there was one on the elements of the offense. My recollection is that there was. And did those elements include that the state had the burden of proving that the defendant was sane at the time of the commission of defense, except for the unreasonable doubt? Was that in there, you know, these elements? Well, they were, although the instruction was internally contradictory. Because at one point it said that if the jury finds Mr. McMurtry not sane beyond a reasonable doubt, it would acquit. So it shifted the burden. And the instruction gave both sides. At one point, put the burden on the state. At the other point, put the burden on the defense. Okay. Your time's up. Thank you. If I might address the issue of ineffective assistance that was just recently being discussed. First, I would have to disagree with Mr. Shea as to whether Mr. Polis could have represented Mr. McMurtry. It's my understanding under the rules that because he was retained counsel, he could have represented Mr. McMurtry. The trial judge probably... Even under the current rules in Arizona? I believe so, Your Honor. I think those rules apply to appointed counsel, not to retained counsel. The trial judge might have explained to Mr. McMurtry what those rules were and what the requirements were and seen if he still wanted to retain Mr. Polis. I've seen that happen. But the short answer is, as Arizona laws stood then, there was nothing in Arizona law that categorically forbade someone with only five years' experience representing a capital defendant. Not that I'm aware of, Your Honor. And, of course, the state takes its chances later on with ineffective assistance of counsel claims when they go up against such a lawyer. Yes, and the state's also in the position of not really being permitted to get into too much who's representing a defendant. You're kind of in a fix there. Yes, Your Honor. On the other hand, it does put some obligation on the prosecution not to push too hard. I was reading transcripts from the trial this morning, and I was noticing in a sidebar where Judge Arnold specifically speaks to Mr. Pimlick, I think it's Pimlick, I'm not sure how to pronounce the name right, saying, don't push this too hard. I think it was Dr. Lawal, he was testifying, questioning the testimony I was reading, says, you know, don't take advantage. Well, the state needs to hold back, it needs to worry. When you've got an inexperienced counsel up against you, you sometimes have to make objections for them because you don't want them to sit there. I don't disagree with you, Your Honor. I do note, though, that Judge Arnold found that Mr. Polis did an exceptional job representing Mr. McMurtry. He obviously felt very strongly about this case. His testimony at the 1994 evidentiary hearing is evidence of that, that he tried to Judge Arnold's testimony? No, not Judge Arnold's testimony, excuse me, Mr. Polis' testimony, that he really felt very strongly about this case and worked very hard on this case. And according to Judge Arnold, who judged the credibility of the witnesses and the evidence, he did an exceptional job for Mr. McMurtry. Mr. Polis said, I worked very hard on this case, and as he looks back on it when he gets later on, he says, now looking back on it, I don't think I did a very good job. He also stated that Mr. McMurtry was his only client who ever received the death penalty, and he would do what he could to try and help Mr. McMurtry. And clearly, in hindsight, one can always see one's mistakes clearly. That doesn't mean that at the time that he didn't act reasonably. And when we talk about the reasonableness of the competency issue, Mr. Shea talks about they didn't know what they were doing. They raised competence prior to trial. So Mr. Polis obviously was aware that this could be an issue. And he raised it. He had experts evaluate Mr. McMurtry. And he again raised it after trial, raised the issue of his demeanor after trial. So he was aware he did raise this issue. And the court— He was aware of it. But in a sense, I share Judge Bybee's view of that motion for a new trial. The motion is not keyed to he was incapable of assisting me. Rather, it's keyed to this chemical straitjacket made him look odd to the jury. I agree with that characterization completely. I mean, I think that's what the motion was. Now, you might say that once the facts have been pointed out to the judge, the judge has a sui sante responsibility to realize what those facts mean, even if the lawyer doesn't put it that way. Or you could also say, well, it should have jumped out at him that the determination by Judge Druk at the end of February doesn't resolve the question when what's happened has been, or if indeed this was what happened, that increasing drugging, increasing tension have given us an incompetent person. Not incompetent because he's always incompetent. No, he's incompetent now. And the lawyer just missed it. I don't think the facts support the fact that he became incompetent during trial. The medications that were given to him, Mr. Mercer's, one of his defenses at trial was insanity. And his witnesses came in and testified about his medications. If a person actually has some kind of mental illness, it makes sense to give them medication for that mental illness. So that wouldn't necessarily alert his attorneys that there was something wrong. We weren't talking about someone who would never raise any issue of his defense of insanity. We also, if we're going to look at ineffective... You know, right from the early days when I first got on the district court in 1967, we were all very sensitive to whether the defendant, particularly when you're taking a guilty plea, have you taken any medications? Have you taken any drugs? Have you done this? Have you done that? So there was a lot of focus on medication. And here you've got the defendant taking medication throughout. Throughout. And it seemed to me that just from just talking this way, just thinking out loud that because of the medications that were being given to him, and I've read one place that he was getting, what, four times the dose that was required to make a person an addict. Was that in there? And one of them? That alone should have alerted the lawyers to raise the competency issue with the judge. And I'm assuming they knew that. I think they knew that. They knew that he was taking pills all the time. And he was being medicated so that that issue could be considered. And it wasn't. And I mean, I was a trial judge myself for 15 years, and I used to watch that. And if I saw a problem, I'd ask counsel, wouldn't you think we ought to have a competency hearing? I mean, it's no big deal to have a competency hearing. So you're sure that you don't run into a problem in the future. Things are being taken a whole bunch of different. I've got a whole list of these drugs that he was taking. There's quite a few. And some of them were capable of adversely reacting with other drugs. Is that what was happening too? Well, first, the only evidence of drugs actually taken by Mr. McMurtry were two times when he was given injections of Librium. The other medications were prescribed, whether he took them or refused them. Well, they had a nurse there at the trial, didn't they? Who was giving them these pills? No, Your Honor. I read about that. Well, that was the testimony of Mr. Polis and Mr. Sadaka, which other witnesses contradicted. Now, what other witnesses contradicted? Mr. Jeff Rogers was a guard at the jail who stated that medication was never given to inmates in court ever. Was he? Now, you say he was a guard at the jail. Was he in court to see whether this happened or not? No, he was not in court. He was at the jail and went to see Mr. McMurtry when he got back. But he, at other times, had worked. And his testimony was that guards... First of all, Mr. Polis and Mr. Sadaka stated that the guards, not a nurse, gave medication to Mr. McMurtry in court. Mr. Rogers was a guard and stated that guards never gave medication. But he was not in the courtroom to say that they did or didn't. He was at the jail. But that contradicted the testimony that he was somehow given the procedures. Yeah, and who else? Mr. Duffner, who was the case agent, never saw Mr. McMurtry given medication in court. Mr. Henlick, the prosecutor, never saw Mr. McMurtry given medication in court. And Mr. Duffner also... The attorneys identified who gave them the... Did they say it was a guard who gave it to him? Somebody in uniform? They said it was a jail guard. They never said specifically a name who gave it to him. I'm very reluctant to disbelieve the attorneys for the particular individual who are, of course, in charge of taking care of this person, when I've got other people who say, you know, that's not their client. They're doing other stuff much of the time. They say, I never saw it. Well, maybe they never did. Well, Your Honor, respectfully, that's a credibility determination that needs to be made by the judge that actually... Well, no, it's not really a credibility determination. I can believe every one of them. That is to say, they said it happened and they said I didn't see it. Well, they were in the courtroom with Mr. McMurtry. And you have all these other witnesses that contradict what the defense attorneys who have stated that they would... Well, didn't you have a sergeant in here that talked about about McMurtry's condition during the trial? Sergeant Duffner was the case agent who was with the Pima County Jail and had worked in the jail and the transportation of inmates previously. So the jail's policy was that guards didn't administer medications. It had to be administered by a nurse or some other authorized person, just like junior high and high school today. Correct. And a guard might supervise the nurse. But that explains the overall policy, of course. It couldn't explain away any particular incident if a guard gave Mr. McMurtry something. And we don't know what that something would have been, whether it was an aspirin, whether it was a sweet tart. We have no clue what it was. And so the problem is that we have the attorneys saying, well, we saw a guard give Mr. McMurtry something which we presumed was medication. What we have is a factual finding of the state court that heard the witnesses that that never happened. So that's what the court has. What weight the court wants to give it is obviously up to the court. Did the attorneys testify that it was routinely given or was this a one-time incident? I don't believe they testified it was routinely given, nor did they say it was a one-time incident. I don't believe they were very clear. The trial lasted about six or seven trial days. So it was not a very lengthy trial. And they said it happened on occasion. They weren't really more specific than that, from what I recall. And again, we're going to talk, again, to the ineffective assistance issue. We can talk about whether they were reasonable or not. We also have to talk about prejudice. Even if they weren't reasonable, Mr. McMurtry has to establish prejudice. What's it mean? Let me start with one and then we'll do the other. Let's, in the sequence which we did with the other side, assume that we find that the judge had enough evidence in front of him by the time he comes up to the sentencing that he should have sua sponte, ordered a competency hearing. And assume further that the 1994 hearing doesn't cure that because we simply can't tell. I understand you don't agree with that. But for the purpose of the question, assume that that's what we find. Is that then, per se, prejudicial? No, Your Honor. Prejudice has to be that it somehow made a difference and it would make a difference if Mr. McMurtry was in fact more competent. What's your case law for that? My understanding of the case law is that if we find that the judge should have ordered a competency hearing and we cannot now retrospectively, confidently determine what would have happened, that that, in fact, is the end of the matter and he's entitled to a new trial. That's my sense of the case law. I agree with you on the Pate issue. Oh, okay, that's Pate. The ineffective assistance issue. Okay, now I want to move to Strickland to see if there's a different standard of proof. Strickland, of course, says, number one, you have to have ineffective assistance and number two, there has to be prejudice. What does prejudice mean in this context? Does it mean merely that he's prejudiced because it wasn't brought to the judge's attention? Or does it mean something more than that? I think it means something more than that, Your Honor. You have case law that says there's something more than that. The case law, generally on Strickland, is that it has to somehow undermine confidence in the outcome. It has to have been probable that it would have changed the outcome. Oh, I know the general... We all know the general formulation of Strickland. Right, under the general test. But do we have Strickland with the facts of this kind of case? Because this comes up in a slightly odd way here. So do we have Strickland with respect to competency hearing where the lawyer's incompetence or ineffective assistance of counsel, pardon me, resulted in not bringing to the judge's attention material that if it had been brought to the judge's attention would have resulted in a competency hearing? Do we have that case of Strickland? If we do, I'm not aware of it, Your Honor. But I would submit to the court that the general standards of Strickland are what needs to be applied. They can be applied in many different situations. Well, I understand that. Right, and in this situation, the issue is was he prejudiced? If he was, in fact, competent, the fact that his attorneys did not bring that to the court's attention doesn't matter because he was competent. So there's no prejudice. But he was competent. Well, but that's obviously in the summer's view. Well, that's obviously our position, and that's the 1994 hearing, if he was entitled to a retrospective hearing. Well, actually, when I'm speaking to myself, I don't find the 1994 hearing conclusive. On that point, I'm pretty clear that I agree with the district judge that it's just too far afterwards, and that Dr. Lawal was not really a recipient witness. And I know that, Your Honor, feels that there were no other recipient witnesses. I would submit that there were several witnesses that had actually been there at the trial and observed Mr. McMurtry that did testify to that. Well, a fair number of them said, you know, I couldn't believe it. I mean, the newspaper reporters and so on, I mean, that was quite a mixed bag of people who were there. The medical testimony, the only person even close to a recipient witness was Dr. Lawal, and for the reasons that I think we've been over, I don't think he was. Your Honor, it looks like my time is up, so I don't know if the Court has further questions. Well, at the trial, was the judge aware of the medication, or made aware of the medication that the petitioner was taking? He was made aware of medication issues after the trial and before the sentencing. Is my understanding. Well, I think, how about Santiago? Correct, he was made aware that he... Didn't he describe the medications administered to the petitioner while he was in jail? The Thorazine, the antipsychotic drug, the Dalmane, which is a sedative hypnotic drug, the chlorhydrate sedative, and the Thorazine, and the Stelazine, and the LLVL, and all that stuff. Yes, there was testimony at trial based on Mr. McMurtry's claim of insanity about medications that he was taking. So you knew all about the drug. Judge knew he was taking all this stuff, right? That in itself does not require... I'm just asking you. He knew he was taking that stuff. I believe so, Your Honor. And why isn't that enough to alert him that if anybody's taking all these pills, it may not be all there at the time of trial. Because those pills are used for therapeutic reasons. Well, I mean, you get... You know, they give you certain pills like... I take so many pills, I can't even remember what they are. They tell you, you take this, you don't die. You do this, you don't do that, you know. And you've got to be very careful about what you're taking, so they don't... When you get old, you start taking pills. That's why we're trying to get Medicare to help us out. I hope you'll vote for that. Anyway, but I would think that somebody's taking all this and the judge is listening to this. He would think, well, you know, he's taking this anti-psychotic drug, and he's taking Thorazine and all the rest of it. You know, and he's got these lawyers out there that never had one of these cases. And so maybe we ought to have a competency hearing and find out just whether this defendant knows what's going on. You know, and can communicate with his lawyers and understand, you know, what's happening. And again, Your Honor, this is the judge that there's been a competency discrimination prior to trial. But that was way before. Well, it was four months before. Well, four months is a long time, you know. Also, the testimony about the drugs relates to his insanity plea. And there were therapeutic uses for these drugs. They're not just given to people for no reason. And again, the judge could be thinking that he's being treated correctly with these drugs. And third, you have a judge. Does he mean that he's insane? His claim was that he was insane. And the drugs can be given to someone to make them understand what's going on. Well, part of the incentive for the lawyers not objecting any point here is that they were afraid that he was going to have one of these violent episodes, go into one of these rages in court, which would have just discredited their whole case. And therefore, they may be happy to have him sedated there. But that still doesn't quite answer, at least for me, the question as to whether he was unable to aid in his defense. But they may have been happy to have had him a whole lot calmer than he had shown himself to be at the county jail. And again, as far as the sedation, sedation can mean two things. It can mean sleeping extra. It can mean you're actually treating someone who's over-anxious, and they're then able to understand what's going on. And there was testimony at the hearing that if someone is overly anxious, and clearly Mr. McMurtry was becoming more anxious as the trial approached and during trial, that actually helps the person to be able to focus and understand what's going on. That's what you have a hearing for. You know, if a judge concludes that a person is not competent to stand trial, and it's not a heavy burden to prove that, then they just recess the trial and send them to, in the federal system, they send them to Springfield. And they stay there until, you know, they're okay, and they know what's going on. Sometimes it's a few months, sometimes it's a few years. And in the state system, the same would be true, that there would be some kind of restoration process. But again, what the trial judge had was information that he had been found competent. Mr. McMurtry was communicating with his lawyers in court. They testified to that. And the judge observed, and other witnesses observed, him writing notes to his lawyers, talking to his lawyers. He wasn't sitting in a stupor during the trial. He was communicating with his counsel. And counsel knew he was taking all these drugs, and I think that should have alerted him. Anyway, we're going to have to give this a lot of thought. Okay, thank you. All right, the matter stands submitted. Thank you for a good argument on both sides. Thank you.
judges: Pregerson, W. Fletcher, Bybee